Good afternoon, and may it please the court. My name is James P. Kemp. I represent and will be arguing on behalf of the appellant, Angela Cummings. I'd like to reserve three minutes for rebuttal. I'm going to start with our defamation claim, because I think that's the most important one. Ms. Cummings... You have two, right? What's that? Two defamation claims. Well, there's two separate... there's the order granting summary judgment. You have two separate claims of defamation. One against the company, and one against Ms. Foster. Isn't that right? Yes, that's correct, Your Honor. There is one against Brayjean Foster, individually, and also against the company, which is based upon a manager, the director of critical care, which is Donna Atkins, her false statement made to employees. It seems like your entire defamation claim against Ms. Foster rises and falls on what Diane, or Ms. Diane, as Diane told the DSH security. I'm just really curious why no one, but especially you, didn't try to depose her. Is there a story there that we don't know about on why... asking her whether or not Foster spread this rumor? There is a story. What happened was the report, that security report, didn't come to my attention until the last day of discovery when Greg Dupong was a security supervisor who we deposed on the last day of discovery, which was May 19th of 2014. He brought that with him, and I had not seen it before that point. As it turned out, the defendants hadn't filed an answer. They actually didn't file an answer until they were given leave to do so on November 10th of 2014. That's a whole long story in and of itself. But at that hearing, when they were granted leave to file their answer, I asked to be able to depose the company under Rule 30b-6 and also to take a deposition of this witness, Diane. And the magistrate didn't permit that deposition. He granted the 30b-6 deposition, but did not grant it as to taking Diane's deposition. So that's sort of the story as to why. Because that report coming in the last day of discovery, we hadn't seen that before. I have a question about damages. In addition to the presumed damages, what other damages would your client seek with respect to the defamation regarding Ms. Foster? Well, she also believes that Ms. Foster's conduct interfered with her prospective economic advantage, and that plays in with the defamation as well. Just assume that's not part of it. I'm just curious. The lost wages and benefits of her employment and the harm to her reputation. It is largely the... You're saying that that was caused by the statement that she was dangerous. That caused it? I think that that did. You did. Is there evidence to that effect? Did anybody say, gee, this is what they said, we've got to fire her? Well, they ultimately... I mean, you're correct. Ultimately, they fired her because of the allegations. That's how she lost her wages and benefits. Lost her employment. Right. And the allegation is that they fired her because of her watching this video. All right. That's true. Plus the three other violations that she made. Well, and those previous violations, again, we... What does this have to do with what Ms. Foster is alleged to have said? Well, Ms. Foster... Our contention is that what Ms. Foster said is part and parcel of the whole thing. Except that it's completely inconsistent with what I understood your theory to be, which is retaliation. That is, as I understood your complaint on the termination, you're alleging that she was fired because she had complained, and not because she had actually violated all these policies. But being fired because you've complained is not the same as being fired because somebody else spread a false rumor about you. So I guess I don't understand, you know, how they fit together. And I appreciate that. I think mostly we've been saying that it's the presumed damages that harmed her reputation is our main damages point. But the way that everything happened at the end there together, I think it's... That was something that was taken into consideration. But I do understand the point that really the retaliation would be the prime source of the loss of her wages and benefits of employment. So... How was it retaliation? I mean, how were the claims pretextual here? Well, the... In particular, there was the idea that she didn't give her phone number to the employer. Her testimony is actually she did give it to the staffing office, and the staffing office didn't update it in her record. The second one was the cell phone. That was a brand new thing that they had. They'd never had these cell phones before. There was no written policy as to what was supposed to happen to it. In fact, they didn't give her a written policy about that until the day that they wrote her up, which was on December 21st of 2012, which was a month after it had happened. And so there was no written policy that she violated. There was nothing... I mean, it seems like, the way I understood your brief, that she was fired based on some sort of sham policies. But there seems to have been actual policies regarding attendance, timekeeping, the cell phone, contact information, and then, I guess, monitoring the telemetry unit. I mean, there was clearly a policy on that. Actually, there wasn't anything that said that she could not do her training modules or watch the video that she was watching, which was on preventing infectious diseases in the hospital. There was nothing on that. And the testimony from Cynthia Armstrong, her co-worker, as well as Ms. Cummings' own testimony, is that this is something that they commonly did because they didn't have enough time to complete all of their tasks. And so they would do these and... But their whole job was to watch these monitors to make sure there was no problems. And I think previously your client reported Ms. Foster for the same exact thing. So I'm not sure I understand how you can say that there was no policy regarding it. It wasn't the same exact thing. First of all, Ms. Foster was actually never written up or given any discipline for that. They talked to her about it. They didn't actually write her up or give her any discipline. And it was completely different because under that circumstance, Ms. Foster was watching YouTube videos. It was like some sort of comedy about some guy that was dancing in a funny way. Whereas Ms. Cummings, in this case, was watching something that was related to her work. It was about preventing infectious diseases in the hospital. And as she was watching it, and the video shows, she was watching her monitors. She looked over at the video a little bit. She watched her monitors. She looked at the video. She moved over to the video and watched that a little bit. It's a 52-second long clip. And those monitors, you don't have to keep your eyes glued to them the whole time. They have alarms. They have audible alarms, and if anything goes wrong, it will draw your attention to it. And there are two people that work in there, and the person that she was working with actually spent a great deal of time. Is there anything in all of that that would require us to find that the treatment of the watching of the video was a substantial, was false and led to her, the difference in treatment between that video and the other video was, oh, they really didn't think it was serious. They thought it was pretextual. I guess my question is, what makes you think it's pretextual for them to say that one piece is that she was watching it? Maybe she could. Maybe she couldn't. But that's one reason. Was it a pretext? It was a pretext because, for one thing, the incident happened on December 1st. And Rajon Foster sent that video to herself and informed the charge nurse on December 1st of 2012. Nobody says a word to her. Nothing happens until she's suspended on January 11th of 2013, 40 days later. If this is such a serious and terrible violation, why aren't they jumping on it right away? It's not necessarily a serious and terrible violation. It's one of many problems they were having. Well, it was the thing that they ended up firing for. I mean, that was the testimony of Mr. Fabi is that the reason that they fired her was the watching of the video. I mean, it was the last straw. And, yeah, so they had papered her file and gotten her to a final warning level. They papered her file. Sure. They issued her three write-ups for something that happened a month before. They did that on December 21st. Well, but the fact that they – I guess what strikes me is that they were relatively inefficient, or maybe they were cautious. But the write-ups didn't – any of them seemed to happen instantaneously, and I'm not sure what that proves. Well, it was three days after she sat down with Mr. Fabi and said, I believe I'm being discriminated against and I'm being retaliated against. It had to do with the scheduling over the holidays. She tells him about her EEOC charge. He was new. He had just started in November. So he tells her about that on the 18th of December. And three days later, she's written up for three things that all happened approximately a month before. The thing with her phone number, they never even came down – I mean, it was her supervisor. Could have just come down and asked her questions about it. They didn't even do that. They said, well, we couldn't reach you by telephone. Well, I'm right here working here two or three days a week on the same schedule as the supervisor. She could have come down. She could have left word in the unit to call. Well, all you're saying is they could have had a different policy that would have worked out just as well, but that's not really the point, is it? I mean, if there's a policy to have your phone number, it doesn't matter to say, well, you could reach me by email or come see me if that's the policy. So I'm not sure what relevance that is. Well, again, our position is with the timing of the way that it happened and giving her three write-ups on one day for things that were sort of remote in time by that point, right after she complains about what she felt was discriminatory or retaliatory and also informing this new HR person of her charges of discrimination that existed, and Mr. Fabi said he testified that he did go and he talked to Ms. Adkins about that, and the next thing you know, three days later, she's getting written up for these, which seemed to be, again, with the cell phone, there was no written policy. She had left it on the desk for the person because the person wasn't there. She'd been getting written up for overtime, so she couldn't stay around and wait for this person, so she did the best thing that she could. She left it right on the desk where the person relieving her should find it, and she left. Now, what happened to it after that, she doesn't know, but at the end of the day, to write her up for that when there was no policy and it was something that was brand new and to put her on this, ultimately, this final warning, we believe was pretextual. We've run out of time. Would you tell us how we know that Ms. Foster originated the rumor about shooting up the plant? So Ms. Cummings was suspended on Friday, January 11th, 2013. On Saturday, January 12th, is when Diane goes to security and says that a workplace violence threat was called in to the telemetry unit. Now, they work in pairs in there. Diane was working with Rayjean Foster. The way we know that is because when Ms. Atkins came... She says, I heard the rumor from many people, right? She heard it from co-workers. Yeah. And the co-worker that she was working with that day... Workers. It's true. It does say co-workers, and I don't know if that's the security person who's writing it, some sort of interpretation. If you don't know, how are we supposed to know that it was Ms. Foster? Because when Ms. Atkins goes in there and tells Cynthia Armstrong and the person that was with her there, Cynthia Armstrong goes with Ms. Atkins and they look at the calendar, at the schedule, and Diane was working with Rayjean Foster. And Rayjean Foster has animus toward Ms. Cummings' house for a long time. A lot of people have had animus towards her. Maybe she had the most, but she was relatively unpopular with a number of people. Isn't that right? There was some testimony as to that. Ultimately, one of the problems I have with this is it seems to me that you may be right that given all the circumstances of all the people who worked in the lab, who knew her, who came up and down, who interacted with your client, it may be that of all of those people, it may be that Rayjean Foster is the most likely to have started the rumor. Right? Well, I think that there's a strong inference based on the timing. That she's the most likely. That she did it. With all those people there having all kinds of reasons, with Diane saying it came from many places, with Ms. Foster saying I didn't say it, with nobody saying, all of these people, nobody says I heard her say it. Well, again, this is about drawing an inference. This is about could a reasonable jury believe that she did it based upon the circumstances that are present, about the timing of the suspension and the timing of when it was said and who was working there with Diane when it was said, and the history between Ms. Cummings and Ms. Foster. What's your best case? I mean, this is kind of an interesting case because there's strong inference. We're supposed to give every inference to the plaintiff here, but at the same time, we're not supposed to let anything go forward just on speculation. And so here it seems like there's a chain of inferences, and I'm just curious if it's enough. And what's your best case to support that it is under Nevada law? Well, with respect to the defamation claim and with Ms. Foster having originated this, again, when you look at the timing and you look at who was working there, they only work in pairs. The best case? Nevada case. Nevada case. That's what you were asked for. Oh. Well, I think all of the— I mean, because that's what comes—for me, it seems like that's where it's coming down to. If there is—I mean, what would make this case be enough in light of the fact that, you know, I think you can argue speculation still. Well, and I'm sorry I can't think of a specific case, but just on the elements, they're simply denying publication. Maybe the reason— And so that's a question of fact. And the question of fact should be the inference should be drawn in my client's favor that Ms. Foster— Do you know of any case anywhere in which a defamation—no, a slander case that was based on a statement where there's no testimony that the defendant made it, there's no testimony that anybody heard her make it, she denies having made it, and nonetheless, despite that, anywhere in the country, do you know of any case in which a plaintiff under those circumstances has recovered a slander verdict? Not off the top of my head, no. This case is unique. As far as I know, most of the reported cases you see on defamation have to do with privileges and not too many where there's a denial of publication. So I haven't seen one like that. You've exceeded your time, but we asked a lot of questions, so we'll give you a minute for rebuttal. I appreciate that. Thank you, Your Honor. Wendy Krensek on behalf of the appellees. I'd like to start my question sort of where we've left off. Do you agree that we have to take all inferences in favor of the plaintiff, who's the nonmoving party? I don't, and that's not even what happens on motions to dismiss. So I'm very surprised to hear that. So tell me why we wouldn't take all the reasonable inferences in favor of the plaintiff in the procedural posture of this case. So even on motions to dismiss under Iqbal Twombly, you do accept well-pleaded facts as true. Here, with respect to Ms. Foster, you've got the possibility that she was working the day that the threat was called in, or in theory. Okay, you're now arguing specific facts, but let me just start by saying I think we have to take all facts that are pleaded in her favor and all reasonable inferences. So I want you to assume that for the purpose of my question. There is evidence, there's definitely evidence that these two people really did not like each other, so there's a motive to say something negative about the plaintiff. And we know that the defendant had reported the plaintiff at least five times for other infractions. So not only was there this bad blood between them, but she had acted on it previously, or a reasonable juror could conclude that you don't just keep turning somebody in for small stuff if you like them or you get along well with them. So there's a motive, and there's also the fact that they were working together at the time, and there's the fact that Diane is the one who reports it, and if you were going to start a rumor, the best way to do it is to say, oh, it isn't me, I just heard this from other people, and I'm just passing it along. But that isn't inconsistent with a jury finding that she's actually not only the one reporting it, but the one starting it. So why isn't that a permissible inference for a jury? That doesn't mean that she would necessarily win anything, but at this stage, why isn't that enough? Well, I think there's got to be a certain ‑‑ it's got to reach at least the level of being a reasonable inference. Why isn't that reasonable, what I've just said? Okay, I don't believe it's reasonable because, A, Ms. Foster, even if she made that statement, she wouldn't have a motive to turn Ms. Cummings in by making that statement. She wasn't ‑‑ nobody was turning her in. It seems like this was just, at most, gossip amongst the employees, according to Diane. Also, there is testimony ‑‑ There was a lot of hostility between Ms. Foster and Ms. Cummings. And what Ms. Foster had testified to is she did not want to have anything more to do with Ms. Cummings. She didn't talk about her. She didn't talk to her. She didn't. But I think more importantly is the testimony is that they surmised that Ms. Foster was the source of that statement simply because somebody supposedly checked a attendance record. And because they didn't like each other and because she kept turning her in all the time for a whole bunch of other stuff. And there were several hundred other employees working in the hospital that day, I'm sure some of which may have not liked Ms. Cummings either. But we don't know that. That's where the guesswork comes in. That's guesswork. But what I'm talking about isn't it. There's evidence to support what I said. Not just guesswork that maybe other people really didn't like her either. So the inference would be based upon the fact that she may have been, Ms. Foster may have been working that day. They worked together that day. She did not like Ms. Cummings. She is the one who said that these threatening comments had been made but blamed it on other people. I mean, I guess based, if that's enough, then Ms. Cummings probably could have sued whoever she identified that didn't like her in the department as well and named them in a defamation lawsuit and gotten past summary judgment on it. Well, I think, well, go ahead. It seems like anyone else we don't have the information on like we do with Ms. Foster and their relationship. This is really a difficult, I think, question here, and that's why we're asking you all these questions. But even at this stage, I think we do have to look at it and give her, give Cummings the reasonable inference here. How come you didn't take Diane's testimony? So the security person that was deposed at the very end of discovery by Mr. Kemp, I believe, was with a third-party security company. So it was not a document that we produced that Valley Health System had. So we didn't know about the existence of her either. We didn't know about the statement and this attribution to Diane at the time. You asked also, did you join in asking the magistrate to be able to depose Diane? No, we did not. Why not? Because we didn't feel like Mr. Kemp had enough evidence to support that claim to begin with discovery. Well, you might have been just worried about what she might have said, right? I mean, that's the other option. I mean, absolutely not. Mr. Kemp took many depositions of coworkers in this case. He couldn't find one person to say that Ms. Foster said that to anybody. Ms. Foster's testimony was she didn't even think she was working that weekend when the threat came in. She came back to work. They only work like two or three days a week, the telemetry technicians, and she heard about the threat being called in from others. So that was her testimony on the topic. So we've got this Diane saying she's heard it from several employees. Who knows who that could be? A security threat to commit workplace violence is obviously something significant, but if people hear about it happening, particularly in their department, there's going to be talk about it. So there wouldn't be just a motive for Ms. Foster to be discussing that. Every employee in the department, I would think, that heard about a call coming into the department like that would discuss it out of concern for their safety. I can move on now and discuss the issue of pretext for the retaliation claim and some of the. . . If you have nothing else to offer on defamation, let me ask you about a pretext. There was the argument that these were sham policies that you relied on in which to terminate and that supported the violations. One of them was the use of the video or looking at the video while she was working, while Ms. Cummings was working and monitoring the telemetry in the telemetry unit. What was the policy? It seems like the policy by DSH was against using the Internet for personal use while on duty. Did this constitute using the Internet, even though it was for work? Correct, because this was not for work. Ms. Cummings testified that she was going onto the computer to check what training modules she needed to complete, and before she got to that point of checking what modules, she saw this video available to watch on the computer, and so she watched it, at which point she was videotaped by one of her coworkers. Just clarify for me, the video was of what? And this is an important point, too, that I don't think made it into anybody's brief, but the hospital did not know what she was watching on the computer, what it was a video of, until this case and discovery and Ms. Cummings explained what it was. But what it turned out to be was an infectious control video, which is available for some employees and may be required to be watched, but wasn't required of Ms. Cummings. And there was a policy. We submitted evidence from the department. Was the incident with respect to watching television, was that the straw that broke the camel's back?  Correct. Ms. Cummings was on a final warning at the time that that policy violation happened, which the decision was made to take her to termination. So the hospital went through all four steps, actually five steps, of its progressive discipline policy with Ms. Cummings. This was the straw that broke the camel's back. Correct. And as a matter of fact, in December, when Ms. Cummings was given those three corrective action, on the same day, two of them were level twos. So they actually essentially gave her a pass on one of those. What about the cell phone policy? It seems like you may not have had a written policy. There was not a written policy on that. We had evidence in the record that the practice and the instruction to the unit coordinator, telemetry technicians, was at the end of your shift, take it and give it to the charge nurse or the incoming unit coordinator. Ms. Cummings did not do that. She just left it on a desk. The cell phone was a relatively new thing in the department. It disappeared. It was never found again. They were trying to call her to find out where she put the department cell phone, and her contact telephone number in the records was not up to date, which resulted in the other level two corrective action being given to her. So yes, she was there other days, and they could have gotten her contact information from her, but the point was when they were trying to reach out to her using the contact information she had on record to find out where she put the cell phone, her contact information was no good. But there wasn't an established rule about that. There wasn't a written rule about what to do with the cell phone. It was just a verbal direction, and then because of this incident with Ms. Cummings, they implemented a written acknowledgment form that they had everybody sign off. Now, the policy about updating contact information was in writing, and in fact Ms. Cummings had previously, with prior contact information changes, gone to human resources and updated her contact information. There's a form that people fill out, so we produced those forms that she had in her personnel file where she'd done it that way in the past. There was no evidence that she'd updated her contact information prior to the December incident with the cell phone. So let's talk about the timeline here a little bit, and you talked about the three corrective actions, but can you tell us why DSH waited the time it did and which Ms. Cummings argues is so long to issue these corrective actions, especially on the heels of Ms. Cummings' complaint? Yes, and there was some testimony about the reasoning for that, and it was mainly just that's not an atypical amount of time to lapse between occurrences and the write-ups with people's schedules. The telemetry technicians in particular sometimes only work two or three days a week, and so their schedules might not always overlap with their supervisors. There was no evidence in the record to show that that was the amount of time that passed was atypical or unusual with what happens with any other employee or disciplinary action in the hospital. So it was really just a situation where you can't draw anything of significance from that passage of time. And then as far as the timing of events, the initial, the Level 1 corrective action, was given before any complaint was lodged by Ms. Cummings, which was the first step in the progressive discipline that led to her termination. And then there are some rather significant time lapses that occur after that, like she filed her charge of discrimination in July, July 31st, is when the notice was sent out. Prior to that time, she'd already gotten not only the Level 1 corrective action, but also the Level 2 corrective action. So that happened before there was even a formal charge filed. Some of the corrective actions were based upon violations of the attendance policy, which is just a point-based policy. So there's really no wiggle room there. You get six free absences. Every absence after that, you get another point. So at seven points, that's a Level 1 corrective action. At eight points, that's a Level 2 corrective action. So there's absolutely nothing unusual about the attendance-based corrective actions that she was given. There were the final decision-makers for the termination decision were Christopher Bullock. He was a new director of critical care for the hospital, so he did not have a history with Ms. Cummings prior to her. New to the hospital. New to the hospital, correct. Prior to her coming in to be questioned during the investigation into the video-watching incident, they didn't even know each other. I don't believe they'd even met. Mr. Fabii was the relatively new HR administrator. He started with the hospital in November of 2012. The termination was in ‑‑ she was suspended in January 11th of 2012. Ms. Cummings is African American. Mr. Fabii is African American. She had met with him on December 18th because she had concerns about not getting a schedule she had asked for over the upcoming holidays. Ms. Cummings recorded the conversation. We had the recording and evidence. There was really nothing unusual about that conversation. She mentioned in the conversation that she had filed a charge of discrimination in the past. Mr. Fabii acknowledged his recollection of that, but neither Mr. Bullock, Mr. Bullock, who is the supervisor that made the decision, he had no idea. His testimony was, and it was uncontradicted, that he had no idea she'd ever made a complaint in the past of any type of protected activity. Labor commissioner discrimination, retaliation, anything. Mr. Fabii was on notice of the charge of discrimination by virtue of Ms. Cummings having told him, but he didn't have any knowledge of her other complaints with respect to filing a complaint with the labor commissioner. There were three different supervisors that issued the disciplinary actions in the progressive discipline, so there's a number of people that were involved in approving these actions. So our position was there really just wasn't sufficient evidence of pretext to get by summary judgment for the retaliation claims. Thank you, counsel. Thank you. Mr. Camp? Thank you, Your Honor. With respect to Christopher Bullock, my client had never even met him before, but it's true that Mr. Fabii, the HR person, was definitely involved with the termination decision. At the excerpts of record, volume two, page 171, there's e-mails between Fabii and Adkins where they're talking about getting the information together on this physical violence threat so that they could act on it quickly, and they were looking at getting her fired even before Christopher Bullock ever got there. So she never met him until she went to a meeting there on January 3, and that was the first time she ever laid eyes on him. They claimed that they were trying to reach her. She said, I never got any messages. I never got any phone calls from this man. I don't know who he is. I'm going to jump around a little bit. The cell phone missing, that was three weeks later. If the cell phone's missing and they need that to do their job, I would think that they would try and get a hold of her before three weeks goes by, and then it was four weeks before they actually wrote her up for that. The level twos, attendance is treated a little bit differently. If you look at their forms, there can be a second level two for attendance only, and so that's why there were two level twos because one of them had to do with attendance, and their policy and their form specifically says that that can be a separate level two. Again, the inference with respect to this phone call into the telemetry room that Diane reported, there are only two people. It's a very small room. It was her and it was Rayjean Foster. Could other people come in and go out? I mean, it wasn't a locked room, and in fact they did. It was a locked room. In fact, they changed the locks. People could come in and go out. What I'm just saying is that it wasn't necessarily the two of them for 12 hours alone. Some people can come in and out. The unit secretary, I think they call it, could come in like on their breaks or on their lunch. That's how Rayjean Foster actually was in there that day that she took the video. So, yeah, there would be people that could come in and out. Rayjean Foster was not on duty that day, you're saying? No, Rayjean Foster was on duty. No, I'm talking about a separate day, on the day when she took the video. Yeah. But on the day that the call came in, again, the testimony was that the call came into that telemetry room where those two people were working the entire day. So Rayjean Foster was there. She had the motive. She had the opportunity. The timing all works out. You're talking about the call about shooting up? Yes. When you say that it came in, you say that it never happened. You say it came in there, but it never happened. No, it came into that room according to their testimony. But not by your client? Not by my client, no. But that's what they're – again, there's no – it's undisputed that it's false. My client never did that. There was never any such thing. Somebody made that up, and we're saying that Rayjean Foster made it up, and she defamed my client. She even said to Cynthia Armstrong, I can't believe that she hasn't been fired already for this video thing. I mean, she's had a profound dislike for my client. And I believe with the motive, the opportunity, the timing, that the inference is reasonable that the phone call came in – I'm sorry, that Rayjean Foster said that the phone call came in and told that to Diane. Thank you, counsel. Actually, the defamatory statement is from Rayjean Foster to Diane that that was false. Thank you, counsel. Thank you. The case just argued is submitted, and we appreciate the efforts of both counsel.
judges: Sack, Graber, Murguia